J-A18026-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: S.V.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 364 WDA 2024 |

Appeal from the Order Entered February 29, 2024
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 073 of 2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 365 WDA 2024 |

Appeal from the Order Entered February 29, 2024
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  072-2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.O.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.J.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 366 WDA 2024 |

Appeal from the Order Entered February 29, 2024
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  074-2023

BEFORE:  OLSON, J., MURRAY, J., and BENDER, P.J.E.

MEMORANDUM BY MURRAY, J.:                    **FILED:  August 20, 2024**

J.J.C. (Father) appeals from the orphans' court's orders terminating his parental rights to his three minor daughters, S.V.C. (born in August 2013), L.O.C. (born in October 2015), and A.M.C. (born in February 2018) (collectively, Children).  We affirm.

The orphans' court summarized the factual and procedural background:

> The factual history of this case began with the [Westmoreland County Children's Bureau (WCCB)] seeking emergency custody of S.V.C., A.M.C., and L.O.C. on May 4, 2022.  [] WCCB sought emergency custody after it was discovered that an older [brother] of the [C]hildren named [A.V.C. (born in September 2012)] had been found dead, and Mother[1] and Father were considered the prime suspects for this homicide.  Following an adjudication hearing on June 7, 2022, services were offered to the [C]hildren to deal with the trauma that [they] suffered, and services were recommended to Mother and Father to address their statuses as indicated perpetrators of physical abuse.
>
> Over the course of the next two years, the [juvenile c]ourt[2] held three permanency review hearings at regular intervals.  At each hearing, the [c]ourt made a determination as to Father's level of compliance with the court-ordered services found in the family service plan and[, Father's] progress made toward achieving reunification with the [C]hildren.  Based upon the evidence presented, Father never received a higher rating than minimal compliance and was never found to make any progress toward reunifying the family unit.  At the time of adjudication, the [c]ourt found that Father posed a grave threat[3] to the [C]hildren

_____

[1] L.E. (Mother) and Father are the parents of all three Children and A.V.C.

[2] The same judge presided over the juvenile and orphans' court proceedings.

[3] "As a usual rule, parental visitation is not denied [in dependency matters] except where a grave threat to the child can be shown."  **Int. of L.B.**, 229 A.3d 971, 976 (Pa. Super. 2020) (citation omitted).  "The 'grave threat'
*(Footnote Continued Next Page)*

- 2 -

if he were to continue having contact with them; therefore, visitation between Father and the [C]hildren [was] suspended at that time. [WCCB] expressed concerns over Father's criminal history and indicated status as a perpetrator of physical abuse, which would demonstrate an inability to protect the [C]hildren. Additionally, [WCCB] was not confident that Father would be cognizant of the [C]hildren's mental health needs and be able to offer them the support necessary for their continued development.

During the course of the dependency matter, [WCCB] contracted for service providers to offer mental health, parenting, and anger management services to Father while he remained incarcerated. These services were aimed to address the issues exemplified in Father's criminal history and involvement with the child welfare system, specifically related to his inability to protect the [C]hildren. While incarcerated, Father participated in a parenting course aimed at addressing self-awareness, self-care, and parenting skills. [WCCB] expressed that, in order for Father to move toward reunification, he would need specific parenting instruction to parent through trauma and minimizing domestic violence risk in the home. After delays in scheduling, Father underwent a mental health assessment while incarcerated, but [WCCB has] not received any indication that Father has followed up with mental health services. Father was able to complete an anger management course while incarcerated[. However, Father has also] been ordered to participate in offender's counseling and domestic violence counseling. Due to his pending criminal matter and the requirements of the program, Father has not participated in any offender's counseling. Lastly, Father has not been able to visit with the [C]hildren since they entered care due to the grave risk to the [C]hildren. In sum, Father has been found to be minimally compliant and made no progress toward reunification with the [C]hildren.

[WCCB] petitioned for involuntary termination [of both Mother's and Father's parental rights to Children] on August 21, 2023, and an initial hearing was scheduled for October 18, 2023. Because both parents requested a fully contested hearing …, the matter was continued to December 21, 2023. At the time of the December 21, 2023 hearing, both Mother and Father requested a

---

standard is met when the evidence clearly shows that a parent is unfit to associate with his or her children." *Id.* at 975 n.3 (citation and some quotation marks omitted).

continuance and asked the [orphans' c]ourt to determine whether [a] termination of parental rights hearing should take place while a criminal matter[,which] played a large role in the basis for adjudicating the minor [C]hildren dependent[,] was still pending. The [c]ourt recessed the matter and allowed the parties to submit written argument on the issue, but Mother and Father ultimately withdrew their request and elected to proceed with the hearing on February 1, 2024. On that date, Mother voluntarily relinquished her parental rights, and a contested hearing on the petition to involuntarily terminate Father's rights began. [The hearing concluded after additional testimony] on February 15, 2024….

Orphans' Court Opinion, 6/14/24, at 2-4 (footnotes added).

Father was present at the hearing and represented by counsel. Adam Gorzelsky, Esquire, represented Children as guardian *ad litem* (GAL) and legal counsel. GAL indicated there was no conflict between Children's legal and best interests. N.T., 2/1/24, at 4.

Documents admitted into evidence[4] detailed the facts leading up to WCCB's May 4, 2022, application for emergency custody of Children. On November 23, 2019, WCCB received a referral stating

Father had beat[en] the oldest child[, A.V.C.,] in the home with "some sort of cord[,]" and [A.V.C.] had suffered numerous welts and scratches. The Father late[r] admitted to beating [A.V.C.] with a small belt. The Father was indicated as a perpetrator of physical abuse. The Mother had confronted the Father regarding the injuries, at which time the Father strangled the Mother,

---

[4] The orphans' court took judicial notice, without objection by Father, of Father's ChildLine referral history and criminal history (WCCB Exhibits 1 and 2), as well as the juvenile court's orders and findings in the dependency matters (WCCB Exhibit 4). *See* N.T., 2/1/24, at 5-9. The orphans' court also admitted the report of Robert Weaver, the Court Appointed Special Advocate (CASA), which, *inter alia*, summarized the dependency case history. *Id.* at 15-16; Court Exhibit 1.

resulting in [two simple assault charges.][5] The Father [pled] guilty and received two years' probation. As a result of the altercation, the Mother filed [a petition for protection from abuse (PFA) against Father. Mother obtained] a final order … on January 21, 2020, granting the [PFA for one year,] until January 21, 2021.

CASA Report, 12/14/23, at 1; *see also* Juvenile Court Order, 5/5/22, at 1 ("In 2019, Father was indicated for beating [A.V.C.] with a cord all over his body. This occurred while [A.V.C] was medically fragile, within a week or two of [A.V.C] having [a] tracheotomy. Father admitted that he had been drinking and beat [A.V.C.] with a belt.").

On November 17, 2021, WCCB received a referral stating A.V.C.

had presented with a swollen black eye[. A.V.C.] had stated that the Father had punched him the previous night. … The referral further stated that [A.V.C.] had disclosed that these "whoopings" happened regularly and that [A.V.C.] was fearful of his Father. The Father was again indicated as a perpetrator of physical abuse.

CASA Report, 12/14/23, at 2; *see also* Juvenile Court Order, 5/5/22, at 1 ("In 2021, Father was indicated because Mother allowed Father to stay overnight at the home, during which time Father punched [A.V.C.] in the right eye, causing a bruise. [A.V.C.] reported this happens regularly."). Father was charged with simple assault and endangering the welfare of children.[6]

On January 12, 2022, WCCB

_____

[5] One of the simple assault charges involved A.V.C. as victim, and the other involved Mother. *See* N.T., 2/1/24, at 97 (Dr. Carol Patterson's testimony that Father acknowledged the criminal charges arose from "the physical disciplining allegations" in 2019).

[6] *See* 18 Pa.C.S.A. §§ 2701(a)(1), 4304(a)(1); *see also* WCCB Exhibit 2. These charges remained pending at the time of the termination hearing. *Id.*

- 5 -

put a safety plan in place in which the Mother was not to allow []
Father unsupervised contact with any of the minor children
[(including A.V.C. and Children),] and that the Mother would be
the contact supervisor.  The safety plan expired on January 17,
2022, and was not renewed as there was no evidence that the
Father was in the home.

CASA Report, 12/14/23, at 2.

On May 4, 2022, WCCB received a referral stating A.V.C.

had run away the previous day and was still missing.  The referral
further stated that the Mother had called the police on the morning
of May 4, 2022, to report [A.V.C.] missing, and that it appeared
that the Mother was not reacting appropriately to the situation and
did not seem concerned for [A.V.C.]'s whereabouts.  [WCCB
received a supplemental referral] later on the same day … that
reported [A.V.C.] had been found deceased outside the family's
home.

*Id.*; *see also* Juvenile Court Order, 9/12/22, at 3 (taking judicial notice that

"[A.V.C.] was found in a shed and died of suffocation.").  Children later

disclosed that Father had been present in the family home the night A.V.C.

went missing.  N.T., 2/1/24, at 53, 82, 90.  They further disclosed that Mother

warned them not to tell anyone that Father had been there that night.  *Id.* at

48.

On May 5, 2022, the juvenile court found:

It was reported that [A.V.C.] ran away [on the evening of May 3],
yet Mother did not report this to police until around 6:00 [a.m. on
the morning of May 4.]  It was also reported that someone has
tampered with the video surveillance camera in the home, and
that Mother first washed [A.V.C.]'s bed sheets before calling the
police.  [On May 4,] when the police told Mother that [A.V.C.] is
dead, she said she didn't believe it and asked if she is under arrest.
When police told Mother she [was] not under arrest, she ran off.
… [At the time,] Father ha[d] not been located by police.

Juvenile Court Order, 5/5/22, at 1; *see also id.* at 1-2 (granting WCCB's application for emergency protective custody of Children). The juvenile court later took judicial notice that, following the May 4, 2022, ChildLine referral "regarding [the] homicide of [A.V.C.]," Father and Mother were both "indicated for causing [the] murder and failure to protect [A.V.C.]…." Juvenile Court Order, 9/12/22, at 3.

Police arrested Father on May 5, 2022. CASA Report, 12/14/23, at 2. The Commonwealth subsequently charged Father with one count each of first-degree murder, criminal homicide, strangulation, unlawful restraint of a minor, concealing the death of a child, abuse of a corpse, and tampering with physical evidence.[7,8] *See* WCCB Exhibit 2. Father entered a plea of not guilty. *Id.* The criminal court ordered that Father have no contact with Children. *See* Juvenile Court Order, 9/20/23, at 2 (noting criminal court order). Father remained incarcerated at the time of the termination hearing, and the charges remained pending. WCCB Exhibit 2. No trial date had been scheduled. *Id.*

---

[7] 18 Pa.C.S.A. §§ 2502(a), 2501(a), 2718(a)(1), 2902(c)(1), 4303(a), 5510, 4910(1).

[8] The Commonwealth charged Mother with aggravated assault of a victim less than 13, endangering the welfare of children, and hindering apprehension or prosecution. *See* 18 Pa.C.S.A. §§ 2702(a)(9), 4304(a)(1), 5105(a)(1); *see also* WCCB Exhibit 1 (summarizing Mother's criminal charges). Her charges remained pending at the time of the termination hearing. *Id.*

Amber Wannamaker, Children's WCCB caseworker, testified that WCCB placed all three Children "together in a pre-adoptive foster home."  N.T., 2/15/24, at 47.  At the time of the termination hearing, Children had been in WCCB custody for 21 months and in the same foster home for 20 months.  *Id.* at 44, 48.

The orphans' court heard testimony from three trauma therapists who have provided services to Children since May 2022: Christine Mahady, ViJaya Greene, and Mikyla Tipton.[9]  Dr. Mahady testified that Children's therapeutic progress has been slow "[b]ecause they're highly traumatized."  N.T., 2/1/24, at 74; *see also id.* at 29 (Ms. Greene's testimony that "this is one of the most severe cases of trauma I have ever seen.").

Dr. Mahady testified that Children were "very, very closed up and very, very guarded in terms of what they said about their family of origin and themselves."  *Id.* at 53.  She stated,

> It's not unusual for kids to go into shock and, kind of, shut down and close up [after] a traumatic incident.  What was particularly compelling about this case is that, if one child would bring up something about the family or [A.V.C.], another child would come in to shush them and say, no, we don't talk about that, or you're not allowed to say that, or I'll beat you up if you keep talking. Even in sessions alone, without the other girls present, they would clam up or not talk.

---

[9] The orphans' court recognized the three therapists as experts in trauma therapy.  N.T., 2/1/24, at 19, 50-51; N.T., 2/15/24, at 6.  Each authored a report that the court admitted into evidence.  *See* WCCB Exhibits 5, 6, and 8.

*Id.* Ms. Greene testified that Children have "a complete emotional shutdown when anything related to their past is brought up." *Id.* at 46; *see also id.* at 47 (Ms. Greene's testimony that "I've never had a situation [like this] where a child has been completely shut down about their past life."); N.T., 2/15/24, at 14 (Ms. Tipton's testimony that L.O.C. becomes "avoidant" when asked about her parents and "has no desire to discuss" the subject).

Dr. Mahady testified that the therapists "found … that the [C]hildren were coached by their parents not to say anything about what was going on in the home." N.T., 2/1/24, at 80. Dr. Mahady found that an "almost cult-like" "mechanism of silence" had been "built into the [Children's family] system." *Id.* at 54. Dr. Mahady opined that Father "was a part of the system," in which Children "were asked to cover up for their parents." *Id.* at 80-81; *see also id.* at 44 (Ms. Greene's testimony that Mother instructed S.V.C. not to communicate about her past); *id.* at 48 (Ms. Greene's testimony that Children disclosed Mother warned them not to tell anyone Father had been in the home the night A.V.C. went missing).

Dr. Mahady testified that, though Children disclosed they saw Father in the home the night of A.V.C.'s death, they did not indicate they saw what had happened. *Id.* at 90. However, Dr. Mahady expressed concern that Children "do know what happened and that that's a big part of this major shutdown." *Id.*; *see also id.* at 63 (Dr. Mahady's testimony that A.M.C. said Father is "in jail now … because of [A.V.C.]"); *id.* at 29 (Ms. Greene testified that S.V.C's

trauma came from "the circumstances surrounding [A.V.C. and] the previous ChildLine reports that have been founded," and Ms. Greene believed S.V.C. has "experienced more that she has not yet disclosed."); WCCB Exhibit 8 at 5 (Ms. Tipton's report, stating S.V.C. told L.O.C. "that their [F]ather killed their brother," and S.V.C. explained she saw this information when searching A.V.C.'s name on a school computer).

Dr. Mahady testified that these circumstances contributed to the therapists' assessment that any contact with either parent posed a grave threat to Children. N.T., 2/1/24, at 54-55. She stated the therapists

> were worried if [Children] saw their parents, because they were so terrified of what happened, essentially, that there was a child that had died, that they knew that, and they would say things like, if I talk, I'll die like my brother.

*Id.* at 55; *see also* N.T., 2/15/24, at 18 (Ms. Tipton's testimony that L.O.C. told her foster parents she was afraid the therapists would communicate with her parents, and "she did not want to end up killed like her brother."). Dr. Mahady testified that L.O.C. said if she told the therapists anything, she would "get whooped." N.T., 2/1/24, at 57. According to Dr. Mahady, Children disclosed Mother had "strangled" them and Father had "whooped" them with a belt. *Id.* at 59, 78.[10]

---

[10] Dr. Mahady expressed concern that Children's

> play was extremely violent. They would hurt the dolls, kick them, throw them. They would have the dolls fight each other. … They

*(Footnote Continued Next Page)*

Ms. Greene testified that Children "really struggled to get along" with each other at the time of their placement in the foster home. *Id.* at 33. "There was a lot of fighting, physical aggression between each other, antagonizing behaviors." *Id.* Ms. Greene testified those issues had "subsided" by the time of the termination hearing, and that the foster parents have been effective in managing Children's behavior. *Id.* at 33-34; *see also id.* at 31 (Ms. Greene's testimony that S.V.C.'s aggression toward her siblings "has dramatically" improved); N.T., 2/15/24, at 18-19 (Ms. Tipton's testimony that L.O.C.'s behavior has improved).

However, Ms. Greene testified that "there is a regression in [Children's] behaviors in response to any inkling of interaction with their parents." N.T., 2/1/24, at 46. Dr. Mahady testified that, when the therapists read Children a letter written by Mother, it caused "absolute upheaval" in their behavior. *Id.* at 67. They began bullying each other, their grades suffered, and they felt betrayed by the therapists. *Id.*; *see also id.* at 31 (Ms. Greene's testimony that Mother's letter "caused a pretty big regression in [S.V.C.'s] behavior…."); N.T., 2/15/24, at 18, 23 (Ms. Tipton's testimony that Mother's letter made

---

> are all very violent with their toys … [which indicates] they could've been exposed to violence in their home, or that they could've experienced physical … abuse.

N.T., 2/1/24, at 57; *see also id.* at 82 (Dr. Mahady's testimony that Children "talked about violence between their parents.  They discussed that [Father] had hurt their [M]other.").

L.O.C. fear the therapists would contact her parents, and S.V.C. "expressed being worried that she had to move back with her parents.").

The therapists testified that Children have expressed that they do not want to see their parents again. Dr. Mahady testified that Children "are terrified of both of their parents." N.T., 2/1/24, at 82; *see also* N.T., 2/15/24, at 13-14 (Ms. Tipton's testimony that L.O.C. "has expressed fear of [her] parents…."). When asked about Children's feelings regarding Father, Dr. Mahady testified:

> In their minds … the stakes are so high here because a child died. They know that. They have said things like, if we talk, we'll die like [A.V.C.] So, in terms of their feelings about [Father], they're very closed up about it, but they do not want to see him.

N.T., 2/1/24, at 68. Dr. Mahady testified Children specifically stated they do not want to see Father. *Id.*; *see also id.* at 36 (Ms. Greene's testimony that S.V.C. "has stated that she does not" want to see Father again.); *id.* at 39 (Ms. Greene's testimony that S.V.C. "has no desire to return to her birth parents, to return to any interaction with her birth parents…."); *id.* at 21, 35, 40 (same).

The therapists agreed that any contact with Father would be harmful to Children. Ms. Greene testified she was "extremely concerned" that "any further contact … with [F]ather" "would cause a dramatic regression in [S.V.C.'s] progress." *Id.* at 36; *see also id.* at 35 (Ms. Greene's testimony that Children "could regress their behaviors to extreme levels if they were to begin interaction with their parents."). Although L.O.C. had prepared a list of

questions for her parents (including asking Father, "Why did you hurt [A.V.C.]?"), Ms. Tipton stressed her opinion that it would not be beneficial for L.O.C. to speak to Father in an attempt to get answers. N.T., 2/15/24, at 15.

Dr. Mahady opined that contact with their parents

> will impact [Children's] development severely. They will have negative behaviors at school. Their grades will suffer. We might have to hospitalize them. They will go into crisis, whatever that looks like for them, if we have to put them back … with their parents.

N.T., 2/1/24, at 64; *see also id.* at 73 (Dr. Mahady's testimony that renewed contact with Father would negatively impact Children's social, emotional, academic, and behavioral development, and could cause them to "act out and hurt each other" or "hurt their foster parents.").

Dr. Mahady testified that, before Children could have "any sort of contact with [F]ather," Children and Father would need "extensive therapy":

> **First of all,** [**Father**] **would have to take accountability and responsibility for everything that happened.** Once that assessment was made from a clinician working with [Father], then we would have to go back and see if the [C]hildren are ready. **It's a massive process that would likely take years.**

*Id.* at 72 (emphasis added); *see also id.* at 56 (Dr. Mahady's testimony that, before Children could have any contact with their parents, "the [C]hildren have to feel safe and the parents have to take accountability for what happened.").

Dr. Mahady opined that the termination of Father's parental rights would be in Children's best interests:

- 13 -

> In my experience, when kids know that they never have to see the offending parent again, they begin to heal, but, in my opinion, there is something looming over the [C]hildren that they [might] have to go back home. That is their biggest fear, that they [will] have to go back to their other life.

*Id.* at 74-75.

The therapists testified Children have a safe and loving relationship with the foster parents, and want to stay with the foster parents permanently. Dr. Mahady testified Children have "consistent, loving experiences" with the foster parents:

> It is consistent school, consistent work on behavior, consistent … nurturing of emotions, the nurturing of a sense of self, feeling empowered, feeling like they're safe. It's really safety and love that are the biggest things that [the foster parents] are offering. That sounds trite, but [Children] feel safe in this home by their own admission.

*Id.* at 65. Dr. Mahady testified that Children "do not acknowledge that they had another family. They do not acknowledge that they had another home. They acknowledge their current foster parent[s] as their parents." *Id.* at 62. When asked to draw a picture of her family, A.M.C. drew "her current foster family and named her current foster mom as her mom. She drew a picture of her foster dad and said it was her dad." *Id.* at 63.

Ms. Greene testified that S.V.C.

> has always been well cared for [in the foster home]. There was actually a session in the fall, which was a major breakthrough in treatment, where [S.V.C.] shared that she feels this is the safest that she's ever been, and she feels loved and cared for in this home.

- 14 -

*Id.* at 33; *see also id.* (S.V.C. "says specifically that she wants to be [with the foster parents] forever."); *id.* at 39 (same); *id.* at 40 (Ms. Greene's recommendation that adoption by the foster parents would be in S.V.C.'s best interest). Ms. Greene testified that the foster mother has helped Children open up by creating a safe space "each night for them to discuss anything that is on their heart … or may be bothering them …, and that is done consistently each night before bedtime." *Id.* at 32.

Ms. Tipton testified L.O.C. wants to stay with the foster parents forever. N.T., 2/15/24, at 14. L.O.C. calls her foster parents "mom" and "papa," and has "talked about feeling safe with them." *Id.* at 19; *see also id.* at 20 (L.O.C. "identifies the foster family [as making] her feel the safest she's ever felt."); *id.* at 19 (L.O.C. sometimes asks "to call foster mom during the [therapy] session just to tell her that she loves her and misses her.").

Robert Weaver, Children's CASA,[11] testified that Children

---

[11] Mr. Weaver testified that he is a retired Pennsylvania State Trooper and county detective. N.T., 2/1/24, at 10-11. As a detective, he specialized in child abuse cases and interviewed over 2,000 children. *Id.* at 11. He described his work as a CASA:

> I just check on the welfare of foster kids and talk to them and just see how they're doing, if they need anything, or if they have any concerns about anything at all, whether it has to do with where they're at or where they lived before. I just spend time with them and see how they're doing.

*Id.* Mr. Weaver testified he spent approximately 20 hours with Children in this case. *Id.*

never spoke about anything in the past, before they were in the foster home. I have talked to a lot of kids, … and those kids will mention their old schools, their old friends, their old pet, but these kids never mentioned anything, other than from the time they moved into the foster home and forward. They've never mentioned their prior residence. They've never mentioned their [M]other, their [F]ather, their brother that was deceased. … To me, it was just very strange.

N.T., 2/1/24, at 12.

Mr. Weaver testified that Children's relationship with their foster parents

was very positive. [Children] were always upbeat. They were very affectionate with the foster family. Both the foster mom and dad would spend time with them. Usually, when we arrived, it was right after [Children] got home from school, so foster mom would be at the dining table with the kids and they'd be doing their homework. They had a routine.

It was just positive. … [A]ll the [Children] have outside activities[, such as basketball, football, and gymnastics.] They would always talk about what they were doing. … Everything was very positive.

*Id.* at 13; *see also id.* at 14 (Mr. Weaver's testimony that Children call their foster parents "mom and dad.").

Ms. Wannamaker testified that Children

are all thriving in their foster home. They are able to talk and confide in their foster parents. They have reported feeling the safest they have ever felt. They have reported wanting to live there forever.

N.T., 2/15/24, at 46. Ms. Wannamaker testified that Children have "a very loving and positive relationship" with their foster parents. *Id.* at 49. "The [C]hildren definitely go to the foster parents for comfort or for support. They just appear to be very happy and comfortable in their foster home." *Id.* Ms. Wannamaker also testified that Children "have a foster brother in the home

who they are very connected with," and that Children "spend a lot of time" with the foster parents' extended family. *Id.* at 49-50.

Ms. Wannamaker further testified that Children "do not speak of either parent since I have become the caseworker. They have not … mentioned [M]other or [F]ather to me." *Id.* at 46-47. She stated that Children had never expressed a desire to spend any time with Father, and suffered no negative effects from not seeing him. *Id.* at 50.

Dr. Carol Patterson, a licensed psychologist, testified that she completed a "psychological/intellectual parenting assessment" of Father on January 8, 2024. N.T., 2/1/24, at 94-95. According to Dr. Patterson, Father said his relationship with Mother was

> pretty good until 2020. Then, he indicated, and I quote, *everything went downhill, she crashed and burned and I was stressed out*. He indicated they had subsequently divorced. …
> He denied any domestic violence between the two of them.

*Id.* at 97 (italics in original). Dr. Patterson testified that "if there was [a history of domestic violence between Father and Mother,] then [Father] was not telling the truth, so that would be a concern." *Id.* at 104.

Dr. Patterson testified that her evaluation included an "Adult-Adolescent Parenting Inventory." *Id.* at 99-100. She indicated Father "measured below average" in two out of five areas, including "the importance of empathizing with children and the importance of establishing and maintaining separate parent and child roles in families." *Id.* at 100. Dr. Patterson testified these

deficits impacted Father's parenting ability. *Id.* at 103. In her report, Dr. Patterson stated that Father's

> below average attitude … in regard to the importance of empathizing with children … indicates that [Father] fears spoiling children, he may not understand or value children's normal developmental needs, he feels that children must act right and be good, [and] he lacks nurturing skill and may be unable to handle parenting stresses.

Dr. Patterson's Report (WCCB Exhibit 7), 1/12/24, at 4.

> Dr. Patterson also stated that Father's

> below average attitude … in regard to the importance of establishing and maintaining separate parent and child roles in families … indicates that [Father] tends to use children to meet his needs, he perceives children as objects for adult gratification, he tends to treat children as confidantes or peers[,] and [he] expects [children] to make his life better by providing him love, assurance, and comfort.

*Id.*; *see also* N.T., 2/1/24, at 103 (Dr. Patterson's testimony regarding Father's "below average" attitudes).

Dr. Patterson testified that her evaluation of Father "revealed some interpersonal relationship concerns, as well as some mental health concerns." *Id.* at 100. She testified that Father "perceiv[es] that … he failed himself and his family." *Id.* at 100-01; *see also* WCCB Exhibit 7 at 4 ("[Father] expressed regret in regard to 'the situation.'"). Dr. Patterson also stated Father reported experiencing depression and anxiety. N.T., 2/1/24, at 101-02. Factors contributing to Father's depression and anxiety included "his incarceration," "the death of his son," and "the removal of [C]hildren from his care." *Id.*

Dr. Patterson concluded "that the factors revealed [in her] evaluation … combine to place [Father] at risk in regard to his ability to parent [C]hildren at this time." WCCB Exhibit 7 at 6; *see also* N.T., 2/1/24, at 110 (same). She recommended that Father undergo further mental health treatment, including "counseling and a psychiatric evaluation to assess the efficacy of any medications that may be helpful to him." *Id.* at 102. She also recommended that Father complete "further parenting education" and "offender/non-offender treatment." *Id.*

Ms. Wannamaker testified that Father had completed parenting and anger management classes. N.T., 2/15/24, at 35-36, 39-40; *see also id.* at 66-81 (testimony of Ryan Reitz and Shannon Orlic, the presenters of the parenting and anger management classes, who confirmed Father's attendance).[12] Ms. Wannamaker testified that Father needs a "more specific [parenting] curriculum, … geared toward the [C]hildren's trauma, working through things they've been exposed to in the past, like the domestic violence in the home." *Id.* at 36. Ms. Wannamaker indicated this "specific curriculum" was not available to Father in prison. *Id.* at 56. The parties stipulated that Father had "availed himself [of] the only parenting and anger management services available to him while incarcerated." *Id.* at 82.

---

[12] Mr. Reitz and Ms. Orlic testified that Father "graduated" from the classes simply by attending, and was not required to take a test or otherwise demonstrate that he learned anything. N.T., 2/15/24, at 68, 79. Neither recalled anything Father may have said during the classes. *Id.* at 72, 79.

The juvenile court had ordered Father to undergo a mental health evaluation and comply with any recommended treatment. Juvenile Court Order, 3/23/23, at 4. However, Ms. Wannamaker testified that Father failed to attend recommended mental health treatment following Dr. Patterson's evaluation. N.T., 2/15/24, at 34; *see also id.* at 55 (Ms. Wannamaker's testimony that the deputy prison warden confirmed Father had "not engaged in any mental health services."). The juvenile court had also ordered Father to engage in abuse offender treatment and domestic abuse counseling. *Id.* at 39. Ms. Wannamaker testified that the treatment provider indicated the treatment was inappropriate "at this time due to [Father's] pending criminal charges and open investigation." *Id.*

Ms. Wannamaker expressed safety concerns regarding Father's criminal history, and she noted Father "has been indicated for physical abuse and the inability to protect the [C]hildren." *Id.* at 44. Father was indicated for abuse of A.V.C. in 2019, 2021, and 2022. *Id.* at 62. Ms. Wannamaker testified that Father did not challenge or appeal any of those indications, and the indications became final. *Id.* at 62-63. She further testified that Father did not challenge the juvenile court's determination that he posed a grave threat to Children, nor did he request a subsequent "re-evaluation" to revisit that determination. *Id.* at 64-65.

Ms. Wannamaker expressed further safety concerns regarding Father's failure to follow the safety plan WCCB implemented in 2021:

Father was not supposed to be living in the home or having unsupervised contact with [A.V.C.] in the home. Based off of interviews with the [C]hildren when they came into [WCCB's] care, we were aware that [Father had been violating the safety plan].

*Id.* at 46-47. Ms. Wannamaker testified that Father never sought assistance for any parenting issues during WCCB's involvement with his family prior to A.V.C.'s death. *Id.* at 63. She also testified she found it "concerning" that Father "represented to [Dr.] Patterson that there was no history of domestic violence[.]" *Id.* at 40.

Ms. Wannamaker testified that Father "has not acknowledged the [C]hildren's trauma." *Id.* at 60. She stated:

[F]or example, when I met with [Father], in December [2023], when we spoke about the concerns of the [C]hildren, [F]ather stated *that's nonsense*. He didn't agree with us. … That was just [F]ather's stance that I had observed, that he did not acknowledge the [C]hildren's trauma.

*Id.* at 60-61 (italics in original).

Ms. Wannamaker stated her belief that Father was not capable of meeting Children's needs:

Father … has never been the primary caregiver of these [C]hildren. Father has not acknowledged the [C]hildren's trauma. Currently, he may not have the knowledge at this time to appropriately care for the [C]hildren and [address] their severe trauma. It also hinders that he's incarcerated. [If he were released,] he doesn't currently have employment or housing. This all remains a concern [in regard to Father's capacity to protect Children], as well with the past indicated statuses. Father's history of domestic violence and abuse is all concerning for the [C]hildren's safety if they would be back with him.

*Id.* at 48-49. Ms. Wannamaker further asserted:

- 21 -

There are concerns for [F]ather's mental health, anger, domestic violence, and parenting. It's un[clear] how long [F]ather will remain incarcerated. We cannot keep these [C]hildren in limbo until we may possibly have a release date for [F]ather. They need permanency. It's already been 21 months.

*Id.* at 46; *see also id.* at 47-50 (Ms. Wannamaker's testimony that Children's best interests would be served by termination of Father's parental rights and Children's adoption by the foster parents).

Father did not testify at the termination hearing. He offered no evidence apart from the testimony of Mr. Reitz and Ms. Orlic, who confirmed his completion of parenting and anger management classes. *See id.* at 66-81.

After the close of evidence, GAL recommended that Father's parental rights be terminated. *Id.* at 83-85. GAL stated:

I believe there is more than sufficient evidence to support termination on a number of grounds. In particular, the fact that [F]ather previously has been indicated for abuse on [A.V.C.] and didn't challenge that, we have those findings. The grave harm assessment, I think, is important because, number one, that led to [F]ather … not having visits with the [C]hildren over this period of time, but I think, if you dig deeper into what all the providers have said about that finding and about what they have experienced with the [C]hildren, I think it's more than clear that, even setting aside the allegations regarding [A.V.C.'s] death, [Children's] reactions and their reasons for not wanting to see the parents are clearly related to what was happening in that home between both [M]other and [F]ather.

When you put those grave harm findings that haven't been challenged … together with the prior indications, I think it presents a pretty clear picture as to why the [Children] are so afraid to see both [M]other and [F]ather, and why they've basically put their prior li[ves] completely in the past and don't want to talk about it. I think that's completely separate from [F]ather's incarceration that, in part, he has no control over at this point.

So, because of that, and because of what [Children] have experienced and the grave harm finding that has not been challenged, I think that there's more than enough evidence to show that it's in the [C]hildren's best interests to achieve permanency and have [F]ather's rights terminated[,] and for [Children] to be adopted.

*Id.* at 84-85.

On February 29, 2024, the orphans' court entered orders terminating Father's parental rights to Children. Father filed timely notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements at all three dockets.[13] The orphans' court has also complied with Rule 1925. This Court consolidated the appeals *sua sponte*.

Father raises the following issues for our review:

I. Whether the [orphans' c]ourt erred in finding that the repeated and continued incapacity, abuse, neglect or refusal of [Father] has caused the [C]hildren to be without essential parental care, control, or subsistence necessary for [their] physical or mental well-being[,] and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by [Father]?

II. Whether the [orphans' c]ourt erred in finding that the [C]hild[ren] have been removed from the care of [Father] by the court, or under a voluntary agreement with [WCCB], [and after] 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the [C]hildren continued to exist and termination of [Father's]

---

[13] The record is unclear whether the juvenile court entered orders in the dependency matters changing Children's permanency goals from reunification to adoption. In any event, Father did not appeal from any orders entered in the dependency matters. The termination orders direct WCCB to file adoption petitions and provide that "[t]he adoption of [Children] may continue without further notice or consent of [Father]." Orphans' Court Orders, 2/29/24, ¶ 5.

parental rights would best serve the needs and welfare of the [Children]?

III. Whether the [orphans' c]ourt erred in finding by clear and convincing evidence that [WCCB] met its burden under 23 Pa.C.S.A. § 2511(b)?

Father's Brief at 5.

In considering Father's claims, we recognize

appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and

quotation marks omitted).

- 24 -

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. First, the orphans' court "must focus on the parent's conduct" relative to the enumerated grounds for termination set forth in 23 Pa.C.S.A. § 2511(a)(1)-(11). *Id.* at 830. If the court finds grounds for termination under Section 2511(a), it must then assess the evidence relative to the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d at 830 (citation omitted).

Here, the orphans' court terminated Father's parental rights to Children under Section 2511(a)(2), (8), and (b). In his first issue, Father challenges the orphans' court's finding that WCCB established grounds for termination under Section 2511(a)(2). Section 2511(a)(2) provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> * * *

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the condition and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 25 -

23 Pa.C.S.A. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination under this subsection "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.*

"[S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019). However, "while 'sincere efforts to perform parental duties,' can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2)." *In re Z.P.*, 994 A.2d at 1117 (citation omitted). We have recognized that a child's life "cannot be held in abeyance while a parent attempts to … assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a

parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

Here, Father argues WCCB "failed to meet [its] burden to show that the cause of [the] lack of parental care and control cannot or will not be remedied." Father's Brief at 11. He asserts that "incarceration alone is not a basis for termination of parental rights" and that courts "must inquire whether a parent has utilized those resources [available] while in prison." ***Id.*** (citing ***In re Z.P.***, 994 A.2d 1108). Father maintains that he "has completed all services available to him while incarcerated," and "[s]hould Father be found innocent of [his pending criminal] charges, he would be released from incarceration and able to provide proper parental care to the [C]hildren." ***Id.***

In ***Z.P.***, this Court observed that in the case of an incarcerated parent,

the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his ... child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his ... children.

Where a non-custodial parent is facing termination of his ... parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect…. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

Thus, a parent's basic constitutional right to the custody and rearing of his ... child is converted, upon the failure to fulfill his ... parental duties, to the child's right to have proper parenting and fulfillment of [the child's] ... potential in a permanent, healthy,

safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated.

Thus, the fact of incarceration alone neither compels nor precludes termination of parental rights. Parents must still provide for the emotional and physical well-being of their children.

*In re Z.P.*, 994 A.2d at 1120 (citations omitted).

Each case of an incarcerated parent facing termination

must be analyzed on its own facts, keeping in mind, with respect to subsection (a)(2), that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what []he is supposed to do in prison.

*In re E.A.P.*, 944 A.2d 79, 84 (Pa. Super. 2008).

Here, the orphans' court found that "the issues that led [Children] to be placed [in WCCB's custody] remain unaddressed. Father has never engaged in services designed to address his status as an indicated perpetrator of physical abuse, [a status] which first arose in November 2019." Orphans' Court Opinion, 6/14/24, at 6; *see also id.* at 8 (finding Children's "exposure to violence in the home" led to their placement in WCCB custody). The orphans' court found as follows:

Dr. Mahady and Ms. Greene testified that, according to their work as trauma counselors, the [C]hildren are still years away from being ready[,] from a mental health standpoint[,] to reunify with Father. Additionally, it should be noted that, due to [Father's] criminal matter still being in the relatively early stages, Father would not be in a practical position to reunify with the [C]hildren in the immediate future…. [T]his [c]ourt can clearly find that the mental health of the [C]hildren still acts as a barrier to reunification. The likelihood is that these [C]hildren would have to stay in the dependency court system for years, awaiting their own mental health progress as well as Father's progress toward demonstrating that the [C]hildren would be safe in his home….

*Id.* at 6. The orphans' court concluded that "the issues that stand as barriers to reunification" were "not likely to be remedied within a reasonable time." *Id.*

Our review confirms the orphans' court's analysis is supported by the record and free from legal error. The record belies Father's assertion that his incarceration was the sole basis for the termination of his parental rights. Even if he were not incarcerated, the juvenile court's grave threat determination barred him from contact with Children. Father never challenged that determination, and has never addressed the circumstances which prompted it. Even setting aside the incidents underlying Father's pending criminal charges, Father pled guilty to assaulting A.V.C. and Mother in 2019. *See* CASA Report, 12/14/23, at 1; WCCB Exhibit 2; N.T., 2/1/24, at 97. Children disclosed Father "whooped" them with a belt, and their therapists reported they are "terrified" of him. *See* N.T., 2/1/24, at 55, 59, 78, 82. Father did not offer any explanation or contrition for these circumstances, nor did he demonstrate any growth or progress. Instead, the evidence showed Father "denied any domestic violence" with Mother and dismissed Children's trauma as "nonsense." *Id.* at 97; N.T., 2/15/24, at 60-61.

Though Father maintains he "has completed all services available to him while incarcerated," Father's Brief at 11, the evidence showed he failed to engage in available mental health services. N.T., 2/15/24 at 34, 55. Importantly, however, it is unclear how increased services would remedy

Father's underlying issues if he continues to deny his violent history. Father's contention that his incarceration is the only thing preventing him from "provid[ing] proper parental care to the [C]hildren" exemplifies the depth of his denial. Father's Brief at 11. While Father's incarceration may limit him in some ways, he has demonstrably failed to take accountability for his parenting failures in ways not limited by his incarceration or his pending charges.

Our review discloses the record amply supports a conclusion that Father's efforts are "insufficient to remedy [his] parental incapacity under subsection (a)(2)." *In re Z.P.*, 994 A.2d at 1117. Accordingly, Father's first issue merits no relief.[14]

In his final issue, Father challenges whether WCCB established grounds for termination under Section 2511(b). Father's Brief at 13-16. When the orphans' court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare under subsection (b):

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. ….

23 Pa.C.S.A. § 2511(b).

---

[14] Because we agree with the orphans' court that WCCB established grounds for termination under Section 2511(a)(2), we need not address Father's second issue, which challenges whether WCCB established grounds under (a)(8). *See Int. of M.E.*, 283 A.3d at 830.

"Notably, courts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." *Id.* at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.* (footnote and citations omitted).

Here, Father argues the orphans' court failed to consider whether a bond exists between Father and Children. Father's Brief at 15. He maintains that "testimony of a bond existing between Father and [C]hildren was given by numerous service providers." *Id.* However, he cites only one example: Ms. Greene's testimony that in April 2022, **before A.V.C.'s death**, Children "were happy to see [F]ather and hugged [F]ather." N.T., 2/1/24, at 42; *see* Father's Brief at 15. Father asserts WCCB failed to present evidence as to "whether termination would sever a necessary and beneficial relationship" between Father and Children. *Id.* at 15-16.

In conducting its Section 2511(b) analysis, the orphans' court cited the following evidence:

> [Mr. Weaver] stated that the [C]hildren almost seem to have compartmentalized and separated their lives, using their entrance into foster care as a landmark event. Mr. Weaver stated that the [C]hildren make no mention of their relationship with Father or their deceased sibling[,] or even their [former] residence and living conditions. To further illustrate the point, Ms. Greene testified that it has taken her almost the full twenty months that she has worked with S.V.C. to get [S.V.C.] to even acknowledge any emotions related to the past. Dr. Mahady has indicated that, by utilizing play therapy, the [C]hildren have offered a glimpse into their past, which she believes has included exposure to violence….
>
> Contrarily, testimony was presented to show that the foster [parents] currently caring for the [C]hildren are committed to their developmental, physical and emotional well-being. According to [Ms. Wannamaker,] the [C]hildren are thriving in [the foster parents'] care, and it would be in their best interest for Father's parental rights to be terminated[,] so they can be adopted and achieve permanency.

Orphans' Court Opinion, 6/14/24, at 7-8.

On the basis of this evidence, the orphans' court determined that Children have formed "secure attachments" with the foster parents "and not with Father." *Id.* at 9. It concluded "that the best interests of S.V.C., L.O.C., and A.M.C. would be served through … the termination of Father's parental rights [and] adoption [by the foster parents]." *Id.*

Our review confirms the orphans' court's analysis is supported by the record and free from legal error. WCCB presented overwhelming evidence that Children are afraid of Father, never want to see him again, and refuse even to acknowledge their previous life with him. Dr. Mahady opined that

- 32 -

"know[ing] they never have to see [Father] again" will help Children "begin to heal." N.T., 2/1/24, at 74. WCCB also presented evidence that Children have a loving and nurturing relationship with the foster parents, with whom they finally feel safe. The evidence showed Children acknowledge the foster parents as their only parents and want to stay with them permanently. Father's reliance on a single instance from April 2022 lends no support to his argument that a bond still exists between Father and Children, and once again only highlights Father's failure to engage with the reality of his and Children's lives.

We discern no error or abuse of discretion in the orphans' court's determination that WCCB established termination would best serve the needs and welfare of Children under Section 2511(b). Therefore, Father's final issue merits no relief.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 8/20/2024